UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| FALCON STAINLESS, INC., | SA CV 08-926 AHS (MLGx) |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT |
| RINO COMPANIES, INC., etc., et al., | OF ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; ORDER THEREON |
| Defendants. | |

**I.**

**INTRODUCTION**

Having considered the Complaint and the papers in support of the motion for preliminary injunction (the "Motion") filed by Plaintiff FALCON STAINLESS INC. ("Falcon" or "plaintiff"), the declarations and exhibits submitted therewith and the reply papers, the opposition papers submitted by Defendants RINO COMPANIES, INC., PERFORMANCE SALES, INC., SOUTHSEA METAL INC., John NOVELLO, and Harry REIGER (collectively, "Rino" or "defendants") and the declarations and exhibits submitted therewith, arguments of counsel, and all

pleadings on file in this action, the Court makes the following findings of fact and conclusions of law in support of its order to grant in part and deny in part plaintiff's motion for a preliminary injunction.

## II.

### SUMMARY OF PLAINTIFF'S GROUNDS FOR RELIEF

Falcon moves for preliminary injunctive relief on the following four grounds:

1. Rino engaged in false advertising in asserting that the Rino products meet ASME A112.18.6 standards;

2. Rino engaged in false advertising in asserting that Rino connectors exceed the flow rate of Falcon's connectors;

3. Rino engaged in trademark infringement by using on its connectors a numbering system confusingly similar to the numbering system used on Falcon connectors; and

4. Rino engaged in trademark infringement by using on its connectors a square with the letter "S" inside (the "'S' mark") that is allegedly confusingly similar to the diamond with the letter "F" inside (the "diamond "F" mark") used on Falcon's connectors.

No other bases for preliminary injunctive relief are properly before this Court as the Court noted at the November 3, 2008 hearing.[1]

For the reasons identified below, the Court denies Falcon's motion for injunctive relief on all grounds except for

---

[1] District courts need not consider arguments raised for the first time in the reply brief. <u>Zumani v. Carnes</u>, 491 F.3d 990, 997 (9th Cir. 2007).

Rino's advertisement that its connectors flow more water than Falcon's connectors.

### III.

### **FINDINGS OF FACT**

**A.     ASME A112.18.6 Facts**

   1.   The International Association of Plumbing and Mechanical Officials ("IAPMO") regulates and sets the standards for plumbing products in the United States.  Novello Decl. ¶ 4; Wolff Decl. ¶ 8.

   2.   Rino and Falcon believe that IAPMO's approval is critical to business success.  Wolff Decl. ¶ 8.

   3.   IAPMO verifies compliance with industry standards, including standard A112.18.6 of the American Society of Mechanical Engineers ("ASME").  See Novello Decl. ¶ 4; Wolff Decl. Ex. A.  ASME A112.18.6 provides, in relevant part, that pursuant to § 3.4, water heater connectors, "metallic water heater connector tubes shall be 300 series stainless steel, 0.010 in. (0.25 mm) minimum wall thickness. . . ."  Wolff Decl. Ex. A. p. 23.  IAPMO is recognized by ASME as one of the "US Engineering Standards Organizations, Societies and Associations."  (Rieger Decl. ¶ 2 & Ex. A.)

   4.   Falcon advertises on its website IAPMO's verification of its products.  (Rieger Decl. ¶ 4 & Ex. B.)

   5.   Rino advertises its compliance with ASME A112.18.6 by pointing to IAPMO's verification of compliance.  (Wolff Decl. Ex. G.)

   6.   Pointing to IAPMO's certification is standard in the industry.  (Novello Decl. ¶ 4; Rieger Decl. ¶ 3.)

      7.   IAPMO has certified Rino's connectors and found them to be in compliance with ASME A112.18.6. Novello Decl. ¶ 4-5 & Exs. A & B; Rieger Decl. ¶ 5. Moreover, an IAPMO auditor tested a sample pipe from Rino and concluded the product complied with ASME A112.18.6. (Novello Decl. ¶ 5 & Ex. B.)

      8.   Falcon hired third party, Stork Materials Testing & Inspection, Inc. ("Stork"), to test some of Rino's connectors, and Stork concluded that the connectors it tested are not ASME A112.18.6 compliant. (See Riley Decl.)

**B.     Water Flow Facts**

      9.   Maximum water flow is a highly desirable characteristic for water connectors. (Wolff Decl. ¶ 6.)

      10.   Rino's Chinese testing laboratory showed a flow rate of 7.238 gallons per minute from its tests. (Novello Decl. ¶ 8 & Ex. F, entry number "3" on the English portion of the chart.) Rino rounded 7.238 to 7.24 in its advertisement. (Supp. Wolff Decl. Ex. C.) Rino's test results were based upon a water flow rate of 1.623 meters per second. Id. This can be converted to feet per second using the conversion formula of 1 meter to 3.2808399 feet. (See Supp. Wolff Decl. ¶ 20.) The calculation yields 5.32 feet per second water velocity (1.623 x 3.28 = 5.32).

      11.   In contrast, Falcon's test results were based upon a test with an initial water velocity of 5 feet per second. (Supp. Wolff Decl. ¶ 20.) This yielded a flow rate of 6.345 gallons per minute as advertised by Falcon. (Novello Decl. ¶ 8 & Ex. E.)

      12.   Rino's advertisement uses Falcon's advertised flow rate of 6.345 gallons per minute (see Novello Decl. ¶ 8 & Ex. E)

4

and Rino's flow rate, as tested by the Chinese laboratory, at 7.24 gallons per minute. (Wolff Decl. Ex. E; Novello Decl. ¶ 8 & Ex. F).

13. Falcon hired Garwood laboratories to conduct a comparison test of its water connectors with Rino's water connectors. (Bellanca Decl. ¶ 3.) The test compared four of the two companies' water connectors under standardized pressures, ambient conditions, and time measurements. (Bellanca Decl. Ex. A. p. 10-12.) The tests showed under 60 psig the Rino 3/4" connector flowed 22.28 GPM and the Falcon 3/4" connector flowed 22.29 GPM. (Id.) The tests showed that under 60 psig, Rino's 1" connector flowed 22.27 GPM and Falcon's 1" connector flowed 22.32 GPM. (Id.) Thus, the tests show that under standardized conditions, Falcon's water connectors do not flow less water than Rino's water connectors. The test does not substantiate Rino's claimed flow rate from its Chinese test.

**C.      Numbering System Facts**

14. Falcon does not have a state or federally registered trademark on its numbering system.

15. Falcon does not use its numbering system in its advertisements or on its website. (Novello Decl. ¶ 9.)

16. Most of the sales for both Falcon and Rino are made to sophisticated retailers and plumbing companies with a strong knowledge of the industry and the products available therein. (Novello Decl. ¶ 3; Wolff Decl. ¶ 3, ¶ 21-22 (Ramey & Associates customer), ¶ 27 (Ferguson Enterprises customer, the largest plumbing wholesale distributor in the world), ¶ 36 (Express Pipe & Co. customer), ¶ 37 (The Plumber's Warehouse

1 customer)).

2     17.  Falcon and Rino both use numerical bar codes on their connectors.  The numbering system used by Falcon is designed to identify the diameter and length of the given connectors.  (Wolff Decl. ¶ 30.)  The numbering system used by Rino serves the same purpose.  (Novello Decl. ¶ 9.)

    18.  The prefix letters Falcon uses on its flexible connectors are either FF or SWC.  (Wolff Decl. ¶ 31.)  Falcon places a space between its letters and the following numbers. (Id.)

    19.  The prefix letters Rino uses on its flexible connectors are SWF.  (Wolff Decl. ¶ 31.)  Rino does not have any spaces between those letters and the numbers that follow.  (Id.)

    20.  As to the numbers on products, the identical numbers as between Falcon and Rino are as follows:  (a) the use of 13418 and 13425 for the 1" by 3/4" product; (b) the use of 11418 and 11424 for the 1 1/4" pipe; and (c) the use of 11218 and 11224 for the 1 1/2" pipe.  (Wolff Decl. ¶ 31.)  As a prefix before these numbers, Falcon uses SWC and Rino uses SWF.  (Id.)

    21.  The non-identical numbers are as follows:  (a) Falcon uses FF 34015, FF 34018, FF 34024 but Rino uses SWF3415, SWF3418, SWF3424 for the 3/4" pipe; (b) Falcon uses SWC 10012, SWC 10018 and SWC 10024, and Rino uses SWF112, SWF118 and SWF 124 for the 1" by 1" pipe; and (c) Falcon uses SWC 20018 and SWC 20024 and Rino uses SWF218 and SWF224 for the 2" pipes.  (Wolff Decl. ¶ 31.)

    22.  For the Falcon products in the preceding paragraph (3/4", 1" x 1" and 2" products), Falcon places a "0" between the

6

dimension numbers.  (Wolff Decl. ¶ 31.)  For the comparable Rino products, Rino does not place a "0" between the dimension numbers.  (Id.)

23.  The numerical bar code numbering system is used by Rino because it is functional and is further required by Ferguson Enterprises, a significant buyer of water connectors.  (Novello Decl. ¶ 9.)  Thus, Rino could not compete with Falcon for Ferguson's business without using the numerical system about which Falcon complains.  (Id. ¶ 14.)

**D.      Geometric Shape and Letter Facts**

24.  Falcon places on its connectors its diamond "F" mark.  (Wolff Decl. ¶ 9.)  Falcon's diamond shape has two angles of less than 90 degrees and two angles of more than 90 degrees.  (Novello Decl. Ex. D.)  Falcon places this notation on the end of the connectors because IAPMO requires certain identifying information.  (Wolff Decl. ¶ 9.)

25.  Falcon's letter "F" is not stylized in any manner; it is simply the capital "F."  (Novello Decl. Ex. D.)

26.  Rino places on its connectors the letter "S" (for Southsea Metal, Inc., the manufacturer) inside a rotated square.  Rino's shape is four angles of 90 degrees each.  (Novello Decl. ¶ 11 Ex. D.)  Rino, like Falcon, puts a notation on its connectors because IAPMO requires it.  (Id. ¶ 10.)

27.  The shapes used by Falcon and Rino are different because Rino uses a square and Falcon uses a diamond.  (Novello Decl. ¶¶ 10-11 & Ex. D.)

28.  The letters used by Falcon and Rino are different because Rino uses a letter "S" and Falcon uses the letter "F."

7

1  (Novello Decl. ¶¶ 10-11 & Ex. D.)  Rino is not aware of any
2  customer having ever been confused as between the diamond "F" and
3  square "S" marks.  (Novello Decl. ¶ 11.)
4      29.  There is at least one other company in the water
5  connector industry, BrassCraft, that also places diamonds on its
6  water connectors in the same location that Falcon places its
7  diamond and Rino places its square.  Novello Decl. ¶ 12.
8      30.  Falcon does not have a state or federally
9  registered trademark on its diamond "F" mark.  There is no
10 evidence that Falcon uses the diamond "F" mark in its advertising
11 of its connectors.

## IV.

## CONCLUSIONS OF LAW

**A.      General Preliminary Injunction Standards**

15     31.  "A plaintiff seeking a preliminary injunction must
16 establish that he is likely to succeed on the merits, that he is
17 likely to suffer irreparable harm in the absence of preliminary
18 relief, that the balance of equities tips in his favor, and that
19 an injunction is in the public interest."  <u>Winter v. Natural Res.</u>
20 <u>Def. Council, Inc.</u>, – U.S. – , 129 S. Ct. 365, 376, 67 ERC 1225
21 (2008).
22     32.  Before a court may issue a preliminary injunction,
23 the movant should post a bond "in an amount that the Court
24 considers proper to pay the costs and damages sustained by any
25 party found to have been wrongfully enjoined or restrained."
26 Fed. R. Civ. P. 65(c).  A court may dispense with a bond when it
27 concludes there is no realistic likelihood of harm to a defendant
28 from enjoining his or her conduct.  <u>Jorgensen v. Cassidy</u>, 320 F.

3d 906, 919 (9th Cir. 2003).

**B.      Falcon's Likelihood of Prevailing on the Merits**

   **i.   General Lanham Act False Advertising Law**

33. "The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." Id.

34. Regarding Court determinations of advertisements involving certifications from regulatory entities, there must be a clear and unambiguous statement from the licensing body about these regulations and certifications. Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999).

35. Regarding advertisements involving comparisons of products, "a plaintiff must do more than show that the tests

9

supporting the challenged claim are unpersuasive." Southland Sod, 108 F.3d at 1139. The plaintiff must demonstrate that the tests are not sufficiently reliable to support the results claimed. Id. The plaintiff can do this either by attacking the validity of the defendant's tests or by demonstrating that other tests contradict or do not support defendant's tests. Id. Additionally, the publication of false comparative claims gives rise to a presumption of actual deception and reliance. Id. at 1146.

### a.    Falcon's ASME Compliance Argument

36.   Falcon fails to demonstrate that it is likely to succeed on the merits of its claim regarding Rino's advertisements that state that it is ASME compliant.

37.   Falcon fails to show that Rino's advertisement that Rino is ASME certified is literally false. Rino has offered evidence from IAPMO – an entity who all parties agree is the governing body for setting standards regarding plumbing products – whereby it certified that Rino's products are ASME A112.18.6 compliant.

38.   Falcon does not provide evidence that demonstrates that IAPMO's certification of Rino's products is invalid or false, thus, plaintiff is not entitled to an injunction prohibiting Rino from advertising the results it received from IAPMO.

39.   Thus, the Court does not reach Rino's unclean hands defense.

40.   Consequently, the Court concludes that Falcon fails to satisfy its burden that it will prevail on the merits of

its claim that Rino's advertisement of its ASME 112.18.6 certification is false.

### b. Falcon's Water Flow Rate Argument

41. Falcon has made a showing that it may prevail on the merits of its claim that Rino's statements that its water connectors flow more water than Falcon's water connectors is false.

42. Falcon requests an injunction prohibiting Rino from advertising that it has faster water flow rates. Rino's advertisement notes Rino's 7.24 GPM and Falcon's 6.345 GPM flow rates. Falcon agrees that it advertised the 6.345 GPM result. Falcon's test evidence shows that Rino's test results are unreliable in two ways: (1) Rino's test was not a controlled comparison test and (2) its own set of controlled tests directly contradict Rino's test results.

43. There is no indication (or complete translation) that the Chinese testing lab on which Rino relied for its water flow measurement (Novello Decl. Ex. F) conducted a test that controlled for variables in order to conduct an accurate comparison between the two products. In fact, both parties agree that Rino's test used a higher water velocity than that used in Falcon's test, which would necessarily result in a higher flow rate. Additionally, there is no evidence that Rino's test used a Falcon water connector with the same water velocity to conduct a valid comparison. Rather, Rino's advertisement that its products have a higher flow rate is not based on any comparison testing.

44. Falcon's evidence provides what Rino did not: a comparison test that controls for variables and uses the same

11

water velocities.  While the results may not provide statistically significant information about which companies' water connectors flow faster, it does show that Rino's advertisement rests on a test that is contradicted by other tests.

45.  Falcon meets its burden at the preliminary injunction stage of showing that Rino's test is not reliable and that other tests directly contradict it.  Thus, Falcon demonstrates a likelihood of prevailing on the merits on its claim that Rino's comparison advertisements are false.

### ii.  General Lanham Act Trademark Law Principles

46.  To establish its trademark infringement claims, Falcon must show:  (1) protectable rights in its marks and (2) a likelihood of confusion arising out of defendants' use of confusingly similar marks.  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000).

47.  Unregistered marks do not receive a presumption of secondary meaning.  See Americana Trading, Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992).  Falcon's alleged marks are unregistered and, accordingly, Falcon is not entitled to any presumption of secondary meaning.

48.  "Trademarks are generally divided into five categories:  (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful."  KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005).  "The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product."

Id. (internal citations omitted).

49. If a mark is generic, it lacks distinction and, therefore, should not receive trademark protection. Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927 (9th Cir. 2005). Whether a mark is generic is a question of fact. Id. at 929. To determine whether a mark is generic, courts "look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." Id. If a mark is not generic but merely descriptive, then it may receive protection only if secondary meaning provides it with distinctiveness. KP Permanent, 408 F.3d at 602.

50. Secondary meaning is a question of fact. Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 614 (9th Cir. 1989). Secondary meaning is present when the purchasing public associates a mark with a particular source code. Id. Factors to assess secondary meaning include: (1) whether actual purchasers associate the product with the trademark; (2) the degree and manner of use of the trademark; and (3) whether the use of the trademark has been exclusive. Id. at 615.

51. Thus, to establish secondary meaning, a plaintiff must show an actual association between the mark and the seller in a substantial portion of the relevant market. See, e.g., Yellow Cab, 419 F.3d at 930.

52. The most significant evidence of secondary meaning is survey evidence. See Vision Sports, 888 F.2d at 615 ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning.").

13

### a. Falcon's Numbering System Trademark Claim

53. Falcon fails to demonstrate a likelihood of prevailing on the merits of its claim that Rino is infringing on Falcon's part numbering system because Falcon does not demonstrate that it has a protectable trademark interest in its system.

54. Under the functional use doctrine, parts of a design that have a functional use may not receive any trademark protection. See Playboy Enter. v. Netscape Commc'n Corp., 354 F.3d 1020, 1030 (9th Cir. 2004). The functionality doctrine applies to words. See Compaq Computer Corp. v. Procom Tech., Inc., 908 F. Supp. 1409, 1423 (S.D. Tex. 1995) (finding that words may be functional and that use of the word "Compaq" as an identifier was functional in case at hand). A design element is functional if it relates to basic consumer demands with the product. Vuitton et Fils S.A. v. J. Young Enters. Inc., 644 F.2d 769, 773 (9th Cir. 1981).

55. "[A] trademark is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." Talking Rain Beverage Co. v. S. Beach Beverage Co., 349 F.3d 601, 603-05 (9th Cir. 2003) (finding a bottle design functional and hence not trademark protected). To determine functionality, courts consider four factors: (1) whether the advertising touts the utilitarian advantages of the design; (2) whether the design results from a comparatively simple or inexpensive method of manufacture; (3) whether the design yields a utilitarian advantage; and (4) whether alternative designs are available. Id. at 603.

56. Falcon bears the burden of proof of establishing that its alleged mark is nonfunctional. See id.

57. Falcon's numbering system is utilitarian because it identifies the size and dimensions of the pipe. While there are alternative designs available, for example Rino inserts a "0" between some of its numbers, the system remains utilitarian because it identifies the parts that it is marking. Also, Falcon admits that it uses the numbering system in response to consumer demand. Thus, Falcon's numbering system is functional, and the numbering system is not subject to trademark protection under the Lanham Act. Playboy Ent., 354 F.3d at 1030; Compaq, 908 F. Supp. at 1423.

58. Because the numbering system is not a protectable trademark, the Court need not assess whether the numbering system has secondary meaning. See Talking Rain, 349 F.3d at 605. Because Falcon lacks a protectable trademark, the Court need not determine whether there is a likelihood of confusion arising from Rino's use of its numbering system. See GoTo.com, 202 F.3d at 1205.

59. Falcon fails to satisfy its burden of a likelihood of success on the merits of its claim that Rino's part numbering system infringes on Falcon's part numbering system. Falcon also fails to identify clearly which subset of the numbering system it seeks to enjoin under trademark infringement principles, so the Court considers Falcon's challenge to be against all the part numbers used by Rino as shown by the evidence submitted to the Court.

//

**b.  Falcon's Diamond "F" Trademark Claims**

60. Falcon fails to demonstrate that it has a protectable trademark interest in its diamond "F" mark and therefore cannot establish a likelihood of prevailing on the merits of its claim that Rino's "S" mark infringes on the diamond "F" mark.

61. Common basic shapes or letters are not distinctive and need proof of secondary meaning. See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006) ("Basic geometric shapes, basic letters and single colors are not protectable as inherently distinctive. . . .  These symbols may be protected only upon a showing of secondary meaning."); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 382-83 (2d Cir. 2005) ("O" shape not inherently distinctive, but a stylized "O" that is more than "a simple linear representation of an ellipse or the letter 'O' can acquire secondary meaning but even then is a weak mark, which will be entitled to only limited protection."); Brooks Show Mfg. Inc. v. Suave Shoe Corp., 716 F.2d 854, 858 (11th Cir. 1983) ("V" is a basic geometric shape that is not inherently distinctive).

62. The diamond "F" mark is not an arbitrary or fanciful designation; the diamond is a basic shape and the letter "F" is unstylized and the first letter of Falcon's name. Falcon's diamond "F" mark is at best descriptive and is not inherently distinctive.  Thus, Falcon must produce evidence of secondary meaning.

63. To establish secondary meaning associated with a basic geometric shape, the moving party must provide "convincing

16

evidence" that the public associates the alleged mark with the plaintiff. See In re David Crystal, Inc., 296 F.2d 771, 778 (Cust. & Pat. App. 1961).

64. Falcon does not produce evidence sufficient to establish secondary meaning. Falcon fails to provide evidence that customers associate its products with the diamond "F" mark or that it is used in any place other than stamped at the end of its connectors. Additionally, the diamond "F" mark is shown to be used only as a stamp on the connector, not in Falcon's paper wrapper on the connector, nor as a logo for the company, nor in its advertisements.

65. There is also some evidence of third-party usage of a diamond shape on other flexible water connector pipes, (Novello Decl. ¶ 12), which eliminates a showing of exclusivity, an element of secondary meaning. Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 581 (2d Cir. 1991) (extensive third party usage of similar words eliminates trademark protection and vitiates a claim that the public associates the commonly used word with a given party).

66. On the current record, it appears that Falcon does not have a protectable trademark interest in its diamond "F" mark. Consequently, the Court need not determine whether there is a likelihood of confusion arising from Rino's use of its "S" mark.

67. Falcon fails to satisfy its burden to show a likelihood of prevailing on the merits and is, therefore, precluded from obtaining relief that would bar Rino from using its "S" mark.

**C.      Irreparable Injury**

68.     Falcon demonstrates likelihood of success on the merits on only one of its four claims: Rino's advertisement that its water connectors flow more water than Falcon's water connectors.

69.     "When an advertisement draws an explicit comparison between the competitor's product and plaintiff's, then such a causative link of irreparable injury is presumed because a misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." Mut. Pharm. Co. v. Ivax Pharm. Inc., 459 F. Supp. 2d 925, 944 (C.D. Cal. 2006) (internal quotations omitted).

70.     Here, Rino's advertisement directly compares its products with Falcon's, thus the Court presumes irreparable injury as to this claim.

**D.      The Balance of Hardships**

71.     The balancing of hardships analysis ensures the issuance of an injunction will not harm the defendants more than a denial will harm the plaintiffs. Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993). "[T]he relative size and strength of each enterprise may be pertinent to this inquiry." Id.

72.     Falcon is the larger of the two enterprises here, as it has been in business more than 25 years and is acknowledged as a leading producer of top-quality products. (Wolff Decl. ¶ 4.) Based on the current state of the record, it demonstrates a likelihood of success on the merits of its claim that Rino's advertisement that compares the water flow capacity of its water

18

connectors and Falcon's is false and irreparable injury related to that claim.

73.  Rino is the newer company and thus an injunction may be more likely to harm it.  Rino does not, however, point to an identifiable harm that would stem from an injunction prohibiting it from making the current comparative advertisement.  (Def. Opp. pp. 20-21.)

74.  Thus, the balance of the hardships does not tip so sharply in Rino's favor as to preclude preliminary injunctive relief related to Rino's current comparative advertisement.

**E.       The Public Interest**

75.  It is in the public's interest to be free from misleading advertising, which is the Lanham Act's purpose.  There is no evidence that granting the preliminary injunction against Rino's comparative advertising would be against the public interest.

**F.       Evidentiary Issues**

The Court has considered the timely submissions of the parties (submitted prior to the time of the hearing).  Any after-submissions have been disregarded.  Plaintiff's Request for Judicial Notice is denied.

//
//
//
//
//
//
//

1 **v.**

2 **ORDER**

3    Based on the foregoing findings of fact and conclusions
4 of law, the Court denies Plaintiff's Motion for Preliminary
5 Injunction, except to the extent that the Court orders defendants
6 enjoined from using Rino's current advertisement that its
7 products have a greater water flow than Falcon's products.
8    The Clerk shall serve these Findings of Fact and
9 Conclusions and Order on counsel for all parties in this action.
10    IT IS SO ORDERED.
11    Dated: December 9, 2008.

           *ALICEMARIE H. STOTLER*
           _____
                ALICEMARIE H. STOTLER
                CHIEF U.S. DISTRICT JUDGE